**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARY MATTHEW THORPE,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.   22-cv-3995** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

**<u>MEMORANDUM OPINION</u>**

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                    **August 10, 2023**

Plaintiff Gary Matthew Thorpe brought this action seeking review of the Acting Commissioner of Social Security Administration's decision denying his claim for Social Security Disability Insurance (SSDI) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for Review (ECF No. 10) is **GRANTED**, and the matter is remanded for further proceedings consistent with this memorandum.

I.      **PROCEDURAL HISTORY**

Plaintiff protectively filed for SSDI, alleging disability since January 1, 2019, due to mental illness, depression, anxiety, panic attacks, lumbar spondylosis, neuropathy in feet and hands, and kidney stones.  (R. 258, 265).  Plaintiff's application was denied at the initial level and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (R. 48, 141-55).  Plaintiff, represented by counsel, and a vocational expert testified at the August 9, 2021 administrative hearing.  (R. 75-103).  On June 29, 2021, the ALJ issued a

decision unfavorable to Plaintiff.  (R. 45-74).  Plaintiff appealed the ALJ's decision, but the

Appeals Council denied Plaintiff's request for review on September 12, 2022, thus making the

ALJ's decision the final decision of the Commissioner for purposes of judicial review.  (R. 1-7).

On October 6, 2022, Plaintiff filed a complaint in the United States District Court for the

Eastern District of Pennsylvania and consented to my jurisdiction pursuant to 28 U.S.C. § 636(C)

two days later. (Compl., ECF No. 1; Consent Order, ECF No. 4).  On February 21, 2023,

Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF

No. 10).  The Commissioner filed a Response on March 9, 2023, and on April 23, 2023, Plaintiff

filed a reply.  (Resp., ECF No. 11; Reply, ECF No. 14).

## II.     FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here

the evidence relevant to the instant request for review.

Plaintiff was born on September 5, 1970, and was 48 years old on the alleged disability

onset date.  (R. 228).  He completed two years of college.  (R. 259).  Plaintiff previously worked

as a manager at a night club.  (*Id.*).

### A.     Medical Evidence

#### 1.     Physical

Plaintiff underwent right- and left-sided radiofrequency ablations in October and

November 2017 and was "very pleased" with the results, reporting an approximately fifty percent

decrease in pain.  (R. 542).  At a February 2018 visit with Thomas Zavitsanos, M.D., his primary

complaint was idiopathic neuropathy of his hands and feet bilaterally with pain a four or five on

a scale of ten.  (*Id.*).  His physical examination results at the time were normal.  (*Id.*).  He was

2

directed to consult with a neurologist but did not do so.  (R. 538).  In the fall of 2018 and early

2019, he underwent lumbar facet joint diagnostic medial branch blockades, resulting in an 80

percent decrease in pain, but the improvement was temporary.  (R. 806, 809, 911, 913).  On

December 5, 2018, he reported to Dr. Zavitsanos that he was attempting to return to work as

security at a night club.  (R. 531).  His physical examinations in this period remained generally

unremarkable.  (*See, e.g.*, R. 502).  He also underwent another radiofrequency ablation on

February 14, 2019.  (R. 520).

At a November 1, 2019 visit with his primary care physician, Helen Volokhonsky, M.D.,

Plaintiff indicated that he had an upcoming appointment with a rheumatologist due to fatigue,

joint pain and to "check inflammatory markers," but the record does not indicate that he kept the

appointment.  (R. 506).  His physical examination results during this period were essentially

unremarkable.  (R. 505, 509).  An MRI a few days later showed mild spondylosis, worse at LS-

S1 with mild bilateral neural foraminal narrowing, but no significant posterior disc herniation,

spinal canal stenosis or narrowing elsewhere in the lumbar spinal column (Tr. 331-32).

Plaintiff's ADLs throughout the relevant period, as reported at his therapy sessions,

included exercising several times per week, cycling, vacationing and going out to dinner with his

wife, going to other social events, and caring for his elderly mother due to the pandemic.  (R.

516, 666-67, 731, 1052, 1057, 1091, 1253, 1255, 1263).  At a December 2019 session, in

particular, he reported "feeling good" physically.  (R. 648).

On December 30, 2019, Plaintiff was seen at Urological Associates Bucks in Langhorne,

Pennsylvania, for recurrent abdominal pain and sepsis.  (R. 338).  Treatment notes record that

Plaintiff had been hospitalized "several times for abdominal pain and sepsis partial small-bowel

obstruction probably from his inflammatory bowel disease" and that he had been seen in the past

for recurrent kidney stones.  (*Id.*).  A CAT scan at this time showed "a stable minimally complex cyst."  (*Id.*).  Physical examination results, including Plaintiff's gait, were unremarkable, as they were at a gastroenterologist visit and an emergency room visit (for acute sinusitis) in March 2020.  (R. 340, 351-52, 361).

At a telemedicine visit with Dr. Zavitisanos on May 14, 2020, Plaintiff reported that his pain had returned and that he was suffering from neuropathy affecting his feet and hands (eight on a scale of 10), although he had not followed up for pain management since his radiofrequency ablations in early 2019.  (R. 516).  He further reported constant low back pain, worsening with extension.  (*Id.*).

On June 18, 2020, Dr. Volokhonsky completed a Physical RFC Assessment wherein she found that Plaintiff could stand and walk for less than two hours and sit for two hours in an eight-hour workday and that he would have to alternate positions at will and take unscheduled breaks.  (R. 578).  She determined that he could not tolerate any exposure to humidity or hazards, rarely tolerate exposure to extreme temperatures or respiratory irritants, crouch, climb stairs or kneel, and occasionally stoop and twist.  (R. 579-80).  She concluded that Plaintiff had significant limitations in manual maneuvers due to his neuropathy and that he would miss more than four workdays per month.  (*Id.*).

On December 30, 2020, neurologist Daniel Birnbaum, D.O., noted that Plaintiff had been diagnosed with neuropathy in 2003 but that he was not currently taking medications for the condition because they had proven ineffective or were contraindicated by his history of kidney stones.  (R. 893).  Instead, Plaintiff reported using ice and "pour-on gels."  (*Id.*).  Plaintiff's limbs were painful to palpation, and he stated that he could not walk more than two blocks due to his neuropathy.  (*Id.*).  Plaintiff further stated that his neuropathy had been confirmed by a prior

electromyography (EMG), but Dr. Birnbaum noted that an EMG from December 2004 indicated no peripheral neuropathy.  (R. 894).  Dr. Birnbaum reviewed Plaintiff's 2019 MRI but could not "find any major [evidence of] an osteo-degenerative processes that would suggest a specific etiology for his [low back pain]." (*Id.*).  As a follow up, Dr. Birnbaum ordered a new EMG. (*Id.*).

On January 6, 2021, medical consultative examiner David Dzurinko, M.D., completed an Internal Medicine Examination of Plaintiff.  (R. 752-69).  Plaintiff chiefly complained of anxiety, depression, panic, "socks and gloves neuropathy," lumbar spondylosis at L4-L5 disc, chronic back pain between seven and 10 on a scale of 10, ulcerative colitis, and acid reflux. (R. 752).  His back pain required his wife to help him up in the morning.  (*Id.*).  He wore a back brace to the examination and reported using a scooter and wheelchair as needed.  (R. 754).  The neuropathy caused "significant numbness and tingling" and he was "severely affected with discomfort in the hands and feet," although his EMGs had been "somewhat equivocal."  (R. 753).  He was positive for 11 of 19 trigger points, indicating possible fibromyalgia, for which he reported he had a diagnosis.  The ulcerative colitis was intermittent but associated with chronic diarrhea and irritable bowel disease.  (*Id.*).  Plaintiff also suffered from recurring kidney stones requiring removal and related procedures and dermatitis covering most of his torso.  (*Id.*).  He further reported lethargy, fatigue, fogginess, cognitive issues and a labral tear, but he had not undergone surgery.  (R. 753-54).

Plaintiff's self-reported activities of daily living (ADLs) included driving, personal care, watching television, listening to the radio and using social media.  (R. 755).  On examination, Plaintiff could squat three-quarters and walk on his toes but not his heels, used no assistive device, needed no help preparing for or participating in the examination, could not perform

straight leg raises, and had a mild limp, mild spinal deformity (scoliosis and kyphosis), sensory deficits in his hands and feet, full strength in his extremities and grip, and intact hand and finger dexterity.  (R. 756-58).  Dr. Dzurinko determined that Plaintiff had a guarded prognosis.  (R. 758).

In the attached Medical Source Statement of Ability to Do Work-Related Activities (Physical), Dr. Dzurinko opined that Plaintiff could never carry more than 20 pounds, lift more than 50 pounds, reach overhead with his left hand, climb ladders or scaffolds, stoop, kneel, crouch, crawl or tolerate exposure to unprotected heights and extreme cold; occasionally lift between 21 and 50 pounds, reach or push and pull with his left hand, feel with his hands or operate foot controls bilaterally, or climb stairs and ramps; frequently lift and carry up to 20 pounds, handle and finger with his left hand, balance, operate a motor vehicle or tolerate exposure to moving mechanical parts; and continuously engage in all maneuvers with his right hand except feeling and tolerate exposure to all other environmental factors.  (R. 760-64).  He further opined that in an eight-hour workday Plaintiff could sit for three to four hours without interruption and up to eight hours total but only stand or walk for 10 to 15 minutes without interruption and one to two hours total.  (R. 761).  He further noted that Plaintiff does not use a cane.  (*Id.*).

On February 5, 2021, State agency medical consultant Crescenzo Guilio Calise, M.D., opined that Plaintiff could occasionally lift and carry up to 25 pounds and climb ladders, ropes, and scaffolds and frequently lift and carry up to 10 pounds, climb ramps and stairs, balance, stoop, kneel, crouch and crawl.  (R. 126-28).  He concluded that Plaintiff could stand and walk or sit for six hours in an eight-hour workday and tolerate unlimited exposure to extreme heat, wetness, humidity, noise, and respiratory irritants, but that he must avoid concentrated exposure

to hazards, vibration and extreme cold.  (R. 128-29).

On May 11, 2021, Plaintiff sought a second opinion regarding his neuropathy from neurologist Anishee Undavia, M.D., who, like Dr. Birnbaum, also recommended that a new EMG be performed.  (R. 896).

Plaintiff reported to primary care physician Frank Balloqui, M.D., on June 14, 2021, that his EMG was normal.  (R. 890).  However, he continued to suffer from neuropathy symptoms, as well as lower back pain.  (*Id.*).  Physical examination results from the visit were unremarkable. (R. 890-91).  At this time Dr. Balloqui also completed a Physical RFC Assessment in which he noted Plaintiff's diagnoses for lumbar spondylosis, neuropathy and ulcerative colitis and opined that in an eight-hour workday he could sit for four hours and stand or walk less than two hours, that he would have to shift positions throughout the workday, and that he would occasionally need to take unscheduled breaks.  (R. 864).  He further opined that Plaintiff could never crouch, kneel, or lift or carry 10 pounds or more, or tolerate exposure to temperature extremes, humidity, or fume, odors, and chemicals; rarely lift and carry up to 10 pounds, stoop, twist or tolerate exposure to dust and hazards; and occasionally climb stairs.  (R. 865).  He determined that Plaintiff had significant limitations with manipulations due to "difficulty grabbing" and that he would be off-task one-quarter of the time or more and miss more than four days of work per month.  (R. 865-66).

### 2.    Mental

On July 18, 2019, Andrew Lopez, M.D., of Merakey completed a psychiatric examination of Plaintiff.  (R. 594).  Plaintiff reported depression, anxiety and panic attacks without a trigger after his father and dog died over the last several months.  (*Id.*).  Upon examination, Plaintiff had a neat appearance, cooperative behavior, appropriate affect and

perceptions, normal speech and thought, no evidence of impairment in concentration or attention, depressed mood, and above average intelligence. (R. 596-97). Dr. Lopez diagnosed depression, generalized anxiety disorder, bereavement and panic, prescribed Plaintiff Viibryd, continued him on Effexor, and referred him for individual therapy. (R. 598). In August 2019, he reported fewer panic attacks since beginning medication. (R. 631, 633). Throughout the fall of 2019, Plaintiff continued to have marital difficulties, although he also reported enjoying a vacation with his wife. (R. 635-46). He reported that his diazepam was helpful during the trip. (R. 719). At the end of October, Plaintiff mentioned contacting Dr. Lopez to change his medications because he believed they were making him tired and sleepy. (R. 641). In December 2019 visit, he reported increased depression due to the holidays causing him to think about his deceased father and dogs. (R. 647). However, later in the month he was "feeling better in mood" and his "anxiety level [was] much lower." (R. 722).

In early March 2020, Plaintiff described having been unable to get out of bed the prior Saturday due to severe depression, although he was "feeling better" by the time of the appointment and looking forward to an upcoming trip to Florida with his wife. (R. 666). Dr. Lopez's medication management notes from the end of April 2020 state that Plaintiff had a low anxiety level and fewer panic attacks (weekly as opposed to thrice weekly), but he was still struggling with low mood and was emotionally distraught and unable to focus after his second dog died. (R. 731). He complained of feeling "like a cripple" and being unable to "do anything" due to pain. (*Id.*). His mental status examination was noteworthy for a "neutral, depressed, anxious mood," although his memory remained intact and his attention, concentration, insight and judgment were "fair." (*Id.*). In his May 2020 therapy sessions, he often focused on his application for disability benefits and marital difficulties and reported that the problems in his

8

marriage were contributing to his depression.  (R. 676, 680).  He began taking testosterone but did not experience any effects from it.  (R. 676, 680, 683).  In June and July 2020, he remained "depressed about not having energy" and fixated on his marital problems.  (R. 683, 687).  He was "still feeling extreme fatigue" and experiencing "chronic depression," which was attributed to his physical problems, but was able to take care of his mother following her hip surgery.  (R. 684, 691).  However, adopting a new dog led him to hope that he would "find renewed purpose in life."  (R. 691).

At a medication management appointment later in July, Plaintiff told Dr. Lopez that he had a low mood and lack of interest, which Plaintiff attributed to low testosterone.  (R. 734).  He also reported chronic pain, although his colitis was noted to be in remission at the time.  (*Id.*).  Upon examination, Plaintiff had a depressed and anxious mood with fair judgment, attention, concentration and insight.  (*Id.*).  By September 2020, he was feeling extreme fatigue with no energy and was depressed when he thought about his marital complications, although he also reported being happier in the company of his new dogs.  (R. 702).  He also had increased anxiety and woke up feeling "afraid."  (R. 703).  Early the following month, he had a lack of energy and was physically exhausted due to his neuropathy.  (R. 704).  He was often too tired to exercise, but still went on outings with his wife.  (R. 704, 706).  At his November 2020 medication management visit, it was noted that Plaintiff was suffering from depression, anxiety and fear "most of the time at a mild level."  (R. 737).  His examination revealed a depressed and anxious mood and fair insight, judgment, attention, and concentration.  (*Id.*).  By the end of year, he was feeling depressed about his marital problems and fatigued due to his physical problems but was able to exercise.  (R. 713, 715).

In January 2021, Plaintiff complained that his anxiety and depression were worsening

and that his medications were not working, although his examination results were generally normal.  (R. 1002).  He stopped taking some of his medications by the end of the month.  (R. 1008).  He missed three consecutive therapy sessions in January and February 2021.  (R. 1231). He continued to experience marital difficulties in February and March 2021.  (R. 1234-44).  At the end of March, he reported having "good days and bad days" and was sometimes having difficulty getting out of bed due to his depression or anxiety, but he was also "socializing with friends to keep his mood up."  (R. 1246).  The following month his mood was improved due to positive developments regarding his vehicle, taxes and disability paperwork.  (R. 1248).  In May 2021, he complained that his anxiety was "not under control" and requested a different medication.  (R. 1014).  He also reported that his depression had increased and he was very anxious about his upcoming disability proceeding, although his anxiety dissipated once he started preparing for the proceeding.  (R. 1255, 1261, 1263).  In June 2021, he complained of debilitating mood swings and increased depression that made it difficult to care for himself.  (R. 1021, 1267).  At the end of the month, he was feeling "terrible," although he was able to socialize with friends at times, use social media and exercise.  (R. 1269, 1272).  He reported that his Effexor prescription had been doubled to help with his anxiety.  (*Id.*).  Mental examination results remained unchanged.  (R. 1014, 1021).

On April 29, 2020, Dr. Lopez completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) in which he opined that Plaintiff had no or poor ability to deal with the public or work stress, function independently, maintain attention and concentration, behave in an emotionally stable manner, relate predictably in social situations, demonstrate reliability, and understand, remember, and carry out detailed or complex instructions; a fair ability to maintain personal appearance and understand, remember, and carry out simple instructions; and

a good ability to follow work rules, relate to coworkers, interact with supervisors, and use judgment.  (R. 859-61).  Dr. Lopez elaborated: "Gary is able to follow work rules and is sociable. He is impaired in his concentration and persistence and follow through due to recurrent depressive symptoms, disabling anxiety and panic attacks and chronic pain."  (R. 859).  He predicted that Plaintiff would decompensate in a work setting due to stress; likely miss three or more workdays per month; have difficulty completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and frequently fail to complete tasks in a timely manner due to his deficiencies in concentration, persistence, or pace.  (R. 862).

On July 28, 2020, State agency psychological consultant Dante Emmanuel Mancini, Ph.D., opined that Plaintiff had mild limitations in interacting with others and in concentrating, persisting or maintaining pace but no other significant limitations.  (R. 109).

On January 6, 2021, psychological consultative examiner Kristen Mulray, Psy.D., completed a Mental Status Examination of Plaintiff.  (R. 740-51).  Plaintiff reported that he attended regular education classes in school, graduated and earned an associate degree afterward.  (R. 740).  He stated that has difficulty falling asleep but that once he does he may sleep "for days at a time."  (R. 741).  Reported depressive symptoms included dysphoric moods, crying spells, hopelessness, loss of interest, irritability, feelings of worthlessness, diminished self-esteem, concentration difficulties, anhedonia, social withdrawal and a passive death wish.  (*Id.*).  Reported anxiety symptoms included excessive worry, irritability and difficulty concentrating.  (*Id.*).  Reported cognitive symptoms and deficits included difficulty learning new material, organization difficulties, short-term memory deficits, planning difficulties, and sequencing difficulties.  (R. 742).  He also had random panic attacks at least once or twice per month, with

11

sweating, breathing difficulties, fear of dying, chest pain and choking sensation.  (*Id.*).  His mental examination was noteworthy for depressed affect and dysthymic mood, but he had good insight and judgment, average cognitive functioning, and intact memory and concentration with the ability to recall objects, repeat digits forward and backward, count (including by serial sevens) and complete simple calculations.  (R. 743).  His ADLs included personal care, driving (although his wife handles most of it), socializing with his wife, using social media, spending time with his dogs, watching television and listening to music.  (R. 743-44).  His prognosis was assessed as fair.  (R. 744).

In the attached Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Mulray opined that Plaintiff had mild limitations in his ability to understand, remember and carry out complex instructions; to make judgments on complex work-related decisions; and to interact appropriately with coworkers and supervisors; and moderate limitations in his ability to respond to usual work situations or changes in a routine work setting.  (R. 745-46).

On January 12, 2021, State agency psychological consultant Karen Louise Plowman, Psy.D., opined that Plaintiff had a mild limitation in concentrating, persisting or maintaining pace but no other significant limitations.  (R. 123).

On April 7, 2021, Alexander Pavlo, L.S.W., wrote a letter stating that Plaintiff has been attending weekly individual therapy sessions at Merakey to manage his depression, anxiety and panic attacks and seeing a psychiatrist every two to three months for medication management.  (R. 879).  He indicated that due to Plaintiff's depression he struggles with low energy, fatigue, oversleeping and low motivation.  (*Id.*).

### B.      Non-Medical Evidence

The record also contains non-medical evidence.  In an Adult Function Report dated July 12, 2020, Plaintiff claimed that his ADLs consist primarily of sleeping most of the day, although he also helps to care for and shop for his elderly mother, helps to feed his and his wife's two dogs, engages in personal care without problems but with reminders from his wife, cooks weekly, makes sandwiches, takes out the trash, walks, drives (including alone), rides in a car as a passenger, bicycles, manages money, watches television, listens to music, socializes on Instagram and the telephone, and visits "some places in Wildwood, [New Jersey]."  (R. 268-72). He endorsed difficulties lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentrating and using his hands.  (R. 273).  He indicated that he cannot walk "far" and that he was "not sure" how long he can pay attention or how well he could follow written instructions or get along well with authority figures.  (*Id.*).  He reported that he does not handle stress or changes in routine well.  (R. 274).  In the attached Supplemental Function Questionnaire, he identified constant, increasing, radiating, sharp, stabbing, throbbing and burning pain in his lower back, hands, and feet.  (R. 277).  Plaintiff's wife, Angela Thorpe, also completed a Function Report – Adult – Third Party, in which she identified largely the same ADLs and difficulties identified by Plaintiff.  (R. 286-93).

At the August 9, 2021 administrative hearing, Plaintiff testified that he stopped working in his position as a nightclub manager due to worsening pain, depression and anxiety.  (R. 81-82).  His physicians have attributed the cause of his depression primarily to physical pain, but Plaintiff believes that "it goes beyond that."  (R. 96).  He is unable to focus due to depression. (*Id.*).  He has back problems and chronic foot and hand pain due to neuropathy.  (R. 85-88).  He described the foot pain as "stabbing" and the hand pain "like[ ] punching steel."  (R. 93).  He

also has a "slight tremor" that affects his grip.  (R. 93-94).  He has acid reflux and ulcerative colitis, which causes bloating, abdominal pain and diarrhea, and he takes medication for both conditions.  (R. 90).  Plaintiff has had six surgeries for kidney stones.  (R. 94).  He experiences panic attacks with racing heartbeat and light-headedness that sometimes cause him to pass out, including a recent incident resulting in an emergency room visit after he cut his head when he fell.  (R. 91-93).  He spends most of his time sleeping, although he also visits his mother weekly in Wildwood Crest, New Jersey, spends time with his dogs and talks with his brother and niece, apparently on the telephone.  (R. 83-84).  He can only sit for a few hours, wears a back brace and uses a cane or motorized scooter as needed.  (R. 88-89).

## III.    ALJ'S DECISION

Following the administrative hearing, the ALJ issued a decision in which she made the following findings:

1.    The claimant last met the insured status requirements of the Social Security Act on September 30, 2021.

2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2019 through his date last insured of September 30, 2021 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: disorders of the spine, ulcerative colitis, depressive disorder, panic disorder, neuropathy, obesity and fibromyalgia (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of

the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he is limited to occasional postural activities; to no use of foot controls; to no pushing/pulling with the lower extremities; to frequent reaching, handling and fingering, but occasional overhead reaching; to unskilled, simple, routine tasks and simple decisions; to occasional changes in the workplace; and to frequent interaction with coworkers, supervisors and the public.

6.   Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on September 5, 1970 and was 51 years old, which is defined as a younger individual age 18-49, on the date last insured. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.   The claimant has at least a high school education (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in

significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2019, the alleged onset date, through September 30, 2021, the date last insured (20 CFR 404.1520(g)).

(R. 50-68).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 69).

## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. § 1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If she is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities.  If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform her past work.  If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The disability claimant bears the burden of establishing steps one through four.

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, he is able to perform substantial gainful activities in jobs existing in the national economy. *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited. A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted). Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The court has plenary review of legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.    DISCUSSION

In his request for review, Plaintiff raises three claims:[1]

> 1. Remand is required because the ALJ ignored the consistency of the medical opinions in favor or her lay assessment of the medical evidence.

> 2. Remand is required because the ALJ failed to include the functional limitations she found credible in the RFC finding or explain their omission.

> 3. The ALJ's step five finding cannot support a finding of non-

---

[1] The Court sets forth and considers Plaintiff's arguments in the order corresponding to the five-step sequential analysis.

disability as a matter of law because all of the identified
occupations are sedentary, and Mr. Thorpe must be found disabled
if limited to unskilled work at the sedentary level.

(Pl.'s Br., ECF No. 10, at 3-18).

### A.     The ALJ's Lay Assessment Versus Consistent Medical Opinions

### 1.     The ALJ's Decision

The ALJ evaluated the three medical opinions at issue in this claim as follows:

> Dr. Volokhonsky, the primary care provider, completed a physical
> residual functional capacity assessment on June 18, 2020 in which
> she opined that the claimant was limited to sitting about 2 hours
> and standing/walking less than 2 hours during an 8-hour workday;
> to alternating positions at will; to taking unscheduled breaks; to
> rarely crouching, climbing stairs or kneeling and occasionally
> stooping and twisting; and to no exposure to humidity or
> workplace hazards and rare exposure to temperature extremes,
> dust, fumes, odors or chemicals. She noted that the claimant would
> have significant limitations in reaching, handling and fingering
> because of neuropathy and opined that he would likely miss about
> 2 days each month. She indicated that she was "unable to assess"
> any limitations for lifting or carrying or for whether the claimant
> would be off tasks any portion of the workday due to his symptoms
> (Exhibit 11F). Dr. Volokhonsky's opinion is partially persuasive
> because it is consistent with her contemporaneous treatment notes,
> but her findings appear to be based primarily on the claimant's
> subjective complaints rather than objective medical findings.
>
> . . . .
>
> Frank Balloqui, M.D., completed a medical source statement on
> June 14, 2021 in which he stated that the claimant was diagnosed
> with lumbar spondylosis, neuropathy and ulcerative colitis and he
> opined that the claimant was limited to sitting about 4 hours and
> standing/walking less than 2 hours in an 8-hour workday; to rarely
> lifting/carrying less than 10 pounds; to no crouching or kneeling,
> rarely stooping or bending and occasionally climbing stairs; and to
> no exposure to temperature extremes, humidity, fumes, odors or
> chemicals and rare exposure to dust or workplace hazards (Exhibit
> 22F). Dr. Balloqui's opinion is somewhat persuasive but it appears
> to be based primarily on the claimant's subjective complaints
> rather than objective medical evidence. The undersigned found that
> the limitations he assessed are not consistent with the nature and
> extent of treatment actually prescribed.

18

. . . .

> Dr. Dzurinko, the medical consultative examiner, opined that the
> claimant was limited to lifting/carrying 20 pounds frequently and
> 50 pounds occasionally; to sitting 3 to 4 hours without interruption
> and up to 8 hours total in an 8-hour workday; to standing or
> walking 10 to 15 minutes without interruption and 1 to 2 hours total
> in an 8-hour workday; to occasional feeling with the dominant
> right upper extremity and no overhead reaching, occasional other
> reaching, feeling and pushing[/]pulling and frequent handling and
> fingering with the left upper extremity; to occasional operation of
> foot controls; to never climbing ladders or scaffolds, stooping,
> kneeling, crouching or crawling, occasionally climbing ramps and
> stairs and frequently balancing; and to no exposure to unprotected
> heights or extreme cold and frequent exposure to moving
> mechanical parts and operating a motor vehicle (Exhibit 17F). Dr.
> Dzurinko's opinion is only partially persuasive because it is
> supported by his examination findings and somewhat consistent
> with the imaging and diagnostic studies as outline above. However,
> a limitation to lifting up to 20 lbs is more appropriate based on the
> totality of the record. Also, Dr. Dzurinko's limitations on standing
> and walking and postural activities, are overly restrictive and
> appear to based more on subjective complaints, rather than
> objective findings.

(R. 64-66).

Under this claim, Plaintiff also takes issue with the ALJ's "catch-all summary" following

her discussion of the medical opinion evidence.  In this summary, the ALJ stated:

> Based on the foregoing, the undersigned finds the claimant has the
> above residual functional capacity assessment, which is supported
> by the longitudinal evidence of record. The treatment records show
> a number of different impairments that in combination warrant a
> limitation to light work with additional postural and manipulative
> limitations. As set forth in detail above, the claimant gave
> inconsistent statements regarding the history of his diagnoses and
> treatment. Objective medical evidence, including MRIs and
> EMG/nerve conduction studies did not show acute findings. He
> continued to consume excessive amounts of alcohol despite
> warnings by multiple specialists. He did not follow up with a
> rheumatologist despite referrals. He claimed that he could not walk
> but also reported that he was going to the gym to workout, spent
> time vacationing, caring for his mother and his dog. His mental
> health treatment records showed no acute symptoms. He ruminated
> about his past affair, but continued to socialize with his wife and

friends, travel and take care of his elderly mother. Giving the claimant all benefit of the doubt, the undersigned allowed for a limitation to light work and additional restrictions to unskilled, simple, routine tasks, few changes and limited interactions.

The undersigned notes that the record showed an extensive history of alcohol abuse, but no diagnosis of an alcohol use disorder has been rendered by any acceptable medical source. However, given the nature and extent of the claimant's underlying physical impairments, the undersigned finds that those impairments and the related functional limitations would persist even in the absence of alcohol consumption. The mental health records also document persistent depression, anxiety and panic secondary to the claimant's physical problems that would persist even in the absence of alcohol abuse. Accordingly, the undersigned finds that the claimant's non-severe substance abuse is not material to the determination of disability.

(R. 66-67).

## 2. The Parties' Positions

Plaintiff observes that these three physicians – the only ones to examine him – all concluded that he either was limited to sedentary work (i.e., sitting with only occasional standing or walking), or was unable to perform any regular and continuing full-time work and that if the ALJ had incorporated such limitations into his RFC he would have been found disabled under the grid rules; however, she rejected these limitations because she determined that they were based on Plaintiff's subjective complaints rather than the providers' own professional observations. (Pl.'s Br., ECF No. 10, at 6-8 (citing 20 C.F.R. § 404.1567(a); *id.* Pt. 404, Subpt. P, App. 2, § 201.14; R. 64-66)). He contends that in finding that he could perform light work (i.e., standing or walking for up to two-thirds of the workday) the ALJ failed to consider "the inherent evidentiary value" of these consistent opinions or explain her basis for rejecting them. (*Id.* at 9-10 (citing 20 C.F.R. § 404.1520c(b); SSR 96-8p, 1996 WL 374184, at *7)). He accuses her of instead substituting her own lay opinion regarding the evidence because nothing in any of the subject medical opinions suggests that they were based on Plaintiff's subjective complaints. (*Id.*

at 11 (citing R. 578-81, 752-74, 864-67)).  On the contrary, Plaintiff points out, Drs. Balloqui and Volokhonsky specifically confirmed that their conclusions were based on objective findings such as clinical findings and laboratory test results and Dr. Volokhonsky readily acknowledged areas of functionality that she was "unable to assess" rather than fill in those gaps with Plaintiff's subjective reports.  (*Id.* at 11-12 (citing R. 579-80, 866)).  Plaintiff adds that Dr. Dzurinko is an "experienced" consultative examiner who would be aware of his duty under the regulations to base his opinion on objective evidence.  (*Id.* (citing 20 C.F.R. § 404.1519n)).  Further, Plaintiff maintains that the ALJ's "catch-all summary" of the record inaccurately states that the objective medical evidence did not show "acute findings," when, in fact, imaging and testing showed various spinal issues.  (*Id.* at 12).  He also dismisses the ALJ's reference to his alcohol use as irrelevant because she ultimately determined that it was "not material" to his impairments.  (*Id.* at 12 (citing R. 66-67)).

The Acting Commissioner cites cases for the proposition that consistency among medical opinions does not entitle them to greater weight or require that the ALJ specifically address that consistency.  (*Id.* at 13 (citing *Freedline v. Kijakazi*, No. 21-CV-405, 2022 WL 4464955, at *1 (W.D. Pa. Sept. 26, 2022); *Marencic v. Comm'r of Soc. Sec.*, No. 3:18-CV 1863, 2020 WL 879410 (M.D. Pa. Jan. 27, 2020), *report and recommendation adopted by* 2020 WL 880758 (M.D. Pa. Feb. 21, 2020); *Hennion v. Berryhill*, No. 4:16-CV-0577, 2019 WL 3017084, at *15 (M.D. Pa. Apr. 1, 2019))).  In addition, she notes that the ALJ expressly stated that she considered the entire record and that, reading her decision as a whole, she adequately explained her finding that the opinions of these physicians were based largely on Plaintiff's subjective complaints, as she was permitted to conclude under the regulations.  (*Id.* at 13-15 (citing 20 C.F.R. § 404.1520c(c)(1)-(2)) (additional citations omitted)).  She also points out that Dr. Calise determined limitations

21

consistent with light work.  (*Id.* at 12).  The Acting Commissioner proffers the following evidence in support of the ALJ's determination that the medical opinions were based on subjective complaints: records reflecting Plaintiff's continued excessive alcohol consumption from at least 2017 through 2021 despite it causing him work, legal and health problems; repeated unremarkable physical examination results; imaging showing only mild spinal problems; an EMG showing no evidence of peripheral neuropathy; his failure to follow up with pain management; a statement to his therapist that he was "feeling good"; his attempted return to work in December 2018; and his ADLs such as working out at the gym, going out to restaurants and caring for his elderly mother and his ability to go on vacation.  (Id. at 9-12 (citations omitted)).

Plaintiff replies that the Acting Commissioner misconstrues his argument as asserting that the ALJ was required to adopt the sit/stand/walk limitations in these opinions, when in fact he contends only that she had to address their consistency with each other.  (Reply, ECF No. 14, at 4 (citing 20 C.F.R. § 404.1520c(b)(2))).  He observes that the ALJ never identified the bases in the record for her outcome-determinative finding that the sit/stand/walk limitations ultimately derived from Plaintiff's subjective complaints rather than objective evidence.  (*Id.*).  He accuses the Acting Commissioner of presenting various *post hoc* rationalizations to justify the ALJ's decision, in particular his alcohol use that the ALJ herself described as "not material to the determination of disability."  (*Id.* at 4-6 (citing R. 67) (additional citations omitted)).  Finally, he argues that the need for the Acting Commissioner to "collect random findings across several pages to explain the ALJ's medical opinion conclusions" demonstrates that her conclusion that the opinions at issue were based on subjective complaints rather than objective evidence is not clearly expressed in the decision itself.  (*Id.* at 6).

### 3.      Analysis

This Court agrees with Plaintiff that this matter should be remanded, on the basis[2] that in determining that the opinions of Drs. Volokhonsky, Balloqui and Dzurinko "appear to be based primarily on the claimant's subjective complaints rather than objective medical findings," (R. 64-66), the ALJ substituted her own lay assessment of the evidence for the judgments of the medical sources.

"In choosing to reject . . . [a] physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject 'a . . . physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988); *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).   "The ALJ cannot, as [s]he did here, disregard . . . medical opinion[s] based solely on h[er] own 'amorphous impressions, gleaned from the record and from h[er] evaluation of [the claimant]'s credibility.'"  *Id.* (quoting *Kent*, 710 F.2d at 115); *see also Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, *4 (M.D. Pa. 2014) (ALJs "'must be careful not to succumb to the temptation to play doctor' because 'lay intuitions about medical phenomena are often wrong'") (quoting *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)).

Tellingly, although the ALJ concluded that Drs. Volokhonsky, Balloqui and Dzurinko based their opinions regarding Plaintiff's sit/stand/walk limitations on Plaintiff's "subjective complaints," she made no attempt to identify in the record where they purportedly did so.

---

[2]  Because the Court finds that remand is appropriate on this basis, it does not consider the alternative arguments proffered by Plaintiff within this claim.

Plaintiff's complaints to these physicians regarding his symptoms such as pain, tingling and numbness naturally involve a degree of subjectivity, (*see, e.g.,* R. 579, 581, 752-53) but there is no indication that such complaints served as the "basis" for the limitations identified by them. On the contrary, Drs. Volokhonsky and Balloqui explicitly confirmed that Plaintiff's "symptoms as demonstrated by *signs, clinical findings and laboratory or test results* [were] reasonably consistent with the diagnoses and functional limitations" set forth in their opinions. (R. 580, 866 (emphasis added) (other emphasis omitted)). Both identified as diagnoses supporting their opinions Plaintiff's neuropathy, chronic lower back pain and lumbar spondylosis, and ulcerative colitis. (R. 578, 864). Dr. Dzurinko, too, noted these diagnoses, as well as Plaintiff's gastroesophageal reflux, recurring kidney stones, irritable bowel disease and diarrhea, and history of fistulectomy, varicocelectomy, ileus and sepsis. (R. 758). In the "Explanation of Opinion" section of Dr. Volokhonsky's assessment, she noted, *inter alia*, that Plaintiff had received nine radiofrequency ablations and was undergoing treatment by an orthopedist. (R. 581). Dr. Dzurinko cited Plaintiff's ablations, in addition to epidural steroid injections and two medial branch neurotomies. (R. 758). He also conducted a physical examination of Plaintiff, including range of motion measurements. (R. 756-58, 766-69). Drs. Volokhonsky and Balloqui, as treating physicians of Plaintiff, repeatedly examined him. (*See, e.g.,* R. 505, 509, 890-91).

Additional reasons exist to doubt the ALJ's conclusion that Drs. Volokhonsky and Dzurinko, in particular, were merely parroting Plaintiff's subjective statements to them. Dr. Volokhonsky acknowledged that she was "unable to assess" either Plaintiff's ability to lift and carry in a competitive work environment or, even more significantly, the percentage of the day that he was likely to be "off task" (R. 579) – an unlikely admission from someone who was merely restating whatever Plaintiff said. Similarly, it remains unclear why Dr. Dzurinko, who

examined Plaintiff at the Social Security Administration's request, would have any reason to blindly accept Plaintiff's subjective complaints without corroborating objective evidence.

The Acting Commissioner submits that the regulations permitted the ALJ to find that these three physicians' opinions were based on subjective rather than objective evidence and, moreover, that the support for this finding can be gleaned from the decision when it is read "as a whole." (Resp., ECF No. 11, at 4). But the cited regulations merely state that the persuasiveness of a medical source opinion increases with the relevance of the support offered for the opinion by the source and with the opinion's consistency with the other medical and nonmedical evidence in the record. *See* 20 C.F.R. § 404.1520c(c)(1)-(2). Nothing in these regulations absolves an ALJ of her duty to support her findings with substantial evidence. And the Acting Commissioner does not explain how reading the decision "as a whole" makes up for the ALJ's failure to identify any support for her conclusion that the medical opinions at issue were based on subjective complaints. Presumably, the Acting Commissioner's canvassing of the record for evidence that supposedly supports a finding of not disabled is meant to fill in the gaps left by the ALJ's decision, but this attempt is both an improper *post hoc* rationalization and off-point, inasmuch as the cited evidence fails to demonstrate that Drs. Volokhonsky, Balloqui and Dzurinko based their opinions on Plaintiff's subjective statements. (*See* Resp., ECF No. 11, at 9-12 (extensively citing evidence that potentially supports a finding of not disabled but that does not substantiate the ALJ's determination that the opinions at issue were based on subjective complaints)); *see also Schuster v. Astrue*, 879 F. Supp. 2d 461, 466 (E.D. Pa. 2012) (the Commissioner may not offer "a post-hoc rationalization" or justification because "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision") (quoting *Keiderling v. Astrue*, No. 07-2237, 2008 WL 2120154, at *3 (E.D. Pa. May 20, 2008)).

Moreover, as Plaintiff observes, much of the evidence proffered by the Acting Commissioner relates to his alcohol use, even though the ALJ specifically found that Plaintiff's physical (and mental) limitations "would persist even in the absence of alcohol consumption" and thus "the claimant's non-severe substance [alcohol] abuse is not material to the determination of disability." (R. 67). Thus, any suggestion that the ALJ's decision should stand because the Plaintiff abused alcohol during the relevant period is, at best, another impermissible *post hoc* rationalization by the Acting Commissioner. The same is true of the Acting Commissioner's observation that State agency reviewer Dr. Calise found that Plaintiff could perform light work. (Resp., ECF No. 11, at 12 (citing R. 66, 126-30)). The ALJ did not discount the opinions of Drs. Volokhonsky, Balloqui and Dzurinko because they conflicted with Dr. Calise's opinion. She discounted them because they were allegedly based upon Plaintiff's subjective complaints. (R. 64-66).

For these reasons, the ALJ's conclusion that the opinions of these three physicians "appear" to be based primarily on subjective rather than objective evidence is, on its face, speculative and unsupported. Accordingly, the Court will remand this matter on this basis.

**B.     Failure to Address the Mental RFC Limitations Found to Be Credible**

**1.     The ALJ's Decision**

Relevant to the instant claim, the ALJ determined:

> With regard to concentrating, persisting or maintaining pace, the claimant had a moderate limitation. In the Function Report the claimant stated that he was able to manage his funds but he was not sure how long he could pay attention or how well he could follow instructions (Exhibit 3E). Treatment notes by Dr. Lopez in 2019 showed that the claimant had largely unremarkable mental status examinations with no impairment in concentration or attention (Exhibit 15F). Psychiatric notes in April 2020 indicated that the claimant was distraught about the death of his dog and that he was unable to focus (Exhibit 15F). However, the mental status

examinations between April and July 2020 showed intact memory and fair concentration and attention. During the consultative examination the claimant was able to count, perform simple calculations, and perform serial 7s (Exhibit 16F). He recalled 3/3 objects immediately and after a delay and recited 5 digits forward and 4 backwards.

. . . .

After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he is limited . . . to unskilled, simple, routine tasks and simple decisions; to occasional changes in the workplace; and to frequent interaction with coworkers, supervisors and the public.

. . . .

Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by the longitudinal evidence of record. . . . His mental health treatment records showed no acute symptoms. He ruminated about his past affair, but continued to socialize with his wife and friends, travel and take care of his elderly mother. Giving the claimant all benefit of the doubt, the undersigned allowed for a limitation to light work and additional restrictions to unskilled, simple, routine tasks, few changes and limited interactions.

(R. 52-53, 66-67).

## 2.    The Parties' Positions

Plaintiff contends that the ALJ failed to include in his mental RFC all the limitations arising from his severe medically determinable impairments of depressive disorder and panic disorder, particularly his limitations in concentration, persistence or maintaining pace as determined at steps two and three of the sequential analysis.  (Pl.'s Br., ECF No. 10, at 14).  He complains that the ALJ determined that he had moderate limitations in this area, indicating a reduced ability to function "independently, appropriately, effectively, and on a sustained basis," yet she disregarded these limitations in formulating his RFC.  (*Id.* at 15 (citing 20 C.F.R. Pt. 404,

Subpt. P, App. 1, § 12.00F(2)(c); *Ramirez v. Barnhart*, 372 F.3d 546, 552-54 (3d Cir. 2004)) (additional citations omitted)).  He argues that the restrictions in the RFC to "simple, routine tasks and simple decisions" and to "occasional changes in the workplace" were geared toward any separate limitations in understanding or adapting and therefore did not account for his deficiencies in concentration, persistence, or maintaining pace, which relate to the timeliness of completing a task rather than its complexity.  (*Id.* at 16-17)  He observes that under the regulations "concentration, persistence or maintaining pace" addresses tasks that the claimant already understands and knows how to perform, such that restrictions on the complexity of work do not sufficiently address limitations in this area of functioning.  (*Id.* at 17 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E)(3))).  Plaintiff maintains that the ALJ accommodated his mild limitation in interacting with others, via the restriction to only "frequent interactions with coworkers, supervisors and the public," yet made no accommodation for his moderate limitation in sustaining work activity.  (*Id.* at 17)  He notes that courts have remanded cases where in formulating the RFC the ALJ failed to accommodate, or otherwise explain the lack of an accommodation for, a functional limitation, even a mild one.  (*Id.* at 17-18 (citations omitted)).

The Acting Commissioner responds that the ALJ's step two and three findings of a moderate limitation in concentration, persistence or maintaining pace does not render the RFC insufficient because the Third Circuit Court of Appeals, addressing *Ramirez*, has rejected any "categorical rule" that a restriction to only simple tasks does not account for moderate limitations in this area of functioning and, instead, has adopted an approach whereby such a limitation suffices if the ALJ provides a valid explanation for it.  (Resp., ECF No. 11, at 15 (citing *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 209-11 (3d Cir. 2019)))  Relying on *Hess*, she denies that step two and three findings compel the use of any "particular language" or "incantations" at any later

28

step of the process.  (*Id.* at 16 (citing *Hess*, 931 F.3d at 209)).  She contends that, consistent with

the Third Circuit's approach, the ALJ validly explained Plaintiff's mental RFC limitations when

in Paragraph B of the step three analysis of Plaintiff's impairments the ALJ acknowledged

Plaintiff's self-reported difficulties focusing but further noted his intact memory, fair

concentration, and ability to count and perform simple calculations.  (*Id.*).  The Acting

Commissioner highlights that the ALJ then stated that the RFC assessment reflects her step three,

Paragraph B findings; discussed Plaintiff's subjective reports, ADLs and mental status

examination results; and concluded that his mental health records evidenced "no acute

symptoms."  (*Id.* at 16-17 (citing R. 56-64, 67)).  Citing several cases from within this circuit, she

maintains that "this explanation is all that was required."  (*Id.* at 17-18 (citations omitted)).

In reply, Plaintiff accuses the Acting Commissioner of constructing a "straw man"

argument by imputing to him the purported contention that *Ramirez* instituted a "categorical

rule" (since struck down by *Hess*, according to the Acting Commissioner) that a restriction to

only simple tasks does not suffice to account for moderate limitations in concentration,

persistence or maintaining pace, when, in fact, *Ramirez*, which remains valid, stands only for the

proposition that functional limitations determined at step two are "relevant" to the subsequent

step four RFC determination.  (Reply, ECF No. 14, at 7).  According to Plaintiff, *Hess* merely

clarified that the magistrate judge in that case had misapplied *Ramirez* by treating it as creating a

categorical rule, but he does not rely on that misapplication.  (*Id.*).  He further observes that *Hess*

does not permit *any* RFC accommodation to suffice to address *any* limitation, but instead

requires that the ALJ explain the limitation.  (*Id.*).  He reiterates that the inquiry into the

sufficiency of the proffered explanation is "case-by-case" and "fact-specific" and claims that the

explanation offered in *Hess* was much more detailed than the discussion cited by the ALJ in this

case.  (*Id.* (citing *Hess*, 931 F.3d at 213-14)).  He submits that it is the ALJ who is attempting to

invoke a "categorical rule," but one whereby a restriction to simple or unskilled tasks necessarily

suffices to accommodate moderate limitations in sustaining work activity.  (*Id.*).  Plaintiff agrees

that no specific language is required, but he insists that neither the ALJ nor the Acting

Commissioner has identified any evidence to substantiate the former's conclusion that the RFC

reasonably accommodated Plaintiff's moderate limitations in the area of functionality at issue.

(*Id.* at 8).

### 3.    Analysis

The dispute between the parties as to this claim boils down[3] to whether the ALJ has

offered a "valid explanation" for her implicit finding that a restriction in the RFC to "simple"

tasks and decisions accommodated Plaintiff's moderate limitations in concentration, persistence

or maintaining pace.  (*See* Pl.'s Br., ECF No. 10, at 17-18 (complaining that "there was no

explanation as to why the ALJ omitted Mr. Thorpe's conclusively moderate limitation" in this

area); Resp., ECF No. 11, at 16 (insisting that here "the ALJ provided a valid explanation" when

she discussed Plaintiff's intact memory, fair concentration, ADLs, ability to count and perform

simple calculations, and mental health records not showing any acute symptoms); Reply, ECF

No. 14, at 7-8 (agreeing that under *Hess* an "ALJ's offered limitation is sufficient ***so long as it is***

***explained***" but positing that the "reasoning cited in *Hess* was significantly more detailed" than

that of the ALJ here because in this case no one has identified "any particular evidence or

---

[3]  Plaintiff initially complains that the ALJ failed to accommodate his moderate
limitations in concentration, persistence or maintaining pace, but he acknowledges that,
alternatively, "their exclusion from the RFC [may be] explained" by the ALJ.  (Pl.'s Br., ECF
No. 10, at 15-18 (citing *Richardson v. Saul*, 511 F. Supp. 3d 342, 357 (E.D. Ky. 2021); *Solomon
v. Comm'r of Soc. Sec.*, 376 F. Supp. 3d 1012 (D. Ariz. 2019); *Lydon v. Comm'r of Soc. Sec.*,
2019 WL 3812379 (D. Colo. 2019); *Simon-Leveque v. Colvin*, 229 F. Supp. 3d 778, 787 (N.D.
Ill. 2017))).

opinion" that would support the ALJ's conclusion that the RFC addressed the moderate

limitation in sustaining work activity) (emphasis in original)).

In *Hess*, the Third Circuit held that the ALJ had provided a "valid explanation" for

restricting a claimant with moderate difficulties in concentration, persistence or maintaining pace

to "simple tasks" by "explain[ing] at length and with sound reasoning" why the difficulties "were

not so significant" that he could not perform simple tasks.  931 F.3d at 213.  This explanation

included a discussion of how the claimant's specific ADLs were consistent with the ability to

perform simple tasks and the observation that progress notes generally indicated "no serious

problems in this area of functioning," as reflected by his intact remote/recent memory, full

orientation, and ability to perform simple calculations.  *Id.* at 214.  The ALJ also highlighted the

claimant's mental status examinations showing effective functioning, opinion evidence that he

could perform simple tasks and the lack of evidence of behavioral problems or "frequent or

regular serious symptoms."  *Id.*; *see also Aguiar v. Kijakazi*, No. 20-18551, 2022 WL 462093, at

*7 (D.N.J. Feb. 15, 2022) (the ALJ presented a valid explanation where she found persuasive

medical opinion evidence showing "some memory deficits" but "generally mild findings

otherwise," including that the claimant could carry out simple instructions, perform basic

calculations and had a "largely intact memory and recall").

Here, the ALJ similarly provided a valid explanation for concluding that Plaintiff could

perform simple tasks, highlighting many of the same types of evidence highlighted in *Hess*.  This

evidence included Plaintiff's self-reported ability to manage funds; mental status examinations

showing "largely unremarkable" results with intact memory and "no impairment in concentration

or attention"; consultative examination results demonstrating that Plaintiff could count, perform

simple calculations including serial sevens, recall three objects immediately and after a delay,

and recite five numbers forward and four backwards; and ADLs including socializing with his wife and friends, vacationing and traveling, and taking care of his elderly mother.  (R. 52, 67 (citing R. 268-77, 591-751)); *cf. Hess*, 931 F.3d at 213-14; *Aguiar*, 2022 WL 462093, at *7.  The ALJ explained that, in light of this evidence, and even "[g]iving the claimant the benefit of the doubt," he could perform light work with "additional restrictions to unskilled, simple, routine tasks . . . ."  (R. 67); *see Karlin v. Saul*, No. 20-3113, 2021 WL 2036649, at *5 (E.D. Pa. May 21, 2021) ("courts have routinely found that a limitation to 'unskilled work' can be sufficient to account for moderate mental limitations") (citing *Weaver v. Saul*, No. 18-3296, 2019 WL 4220927, at *1 n.1 (E.D. Pa. Sept. 5, 2019); *Starr v. Saul*, No. 19-920, 2020 WL 1975080, at *17 (E.D. Pa. Apr. 4, 2020)).  Although this explanation may not have been as "length[y]" as that provided in *Hess*, it is nonetheless "valid" and backed by substantial evidence, and as such it suffices to support the inclusion of a restriction to "simple, unskilled, routine tasks" to address Plaintiff's moderate difficulties in sustaining work activities.  *See Hess*, 931 F.3d at 213.  Accordingly, remand on the basis of this claim is denied.[4]

---

[4]  Plaintiff cites several opinions for the proposition that courts have remanded cases "[u]nder similar circumstances," but these matters are distinguishable.  In *Green v. Colvin*, the Commissioner, unlike the Acting Commissioner here, did not dispute that the ALJ failed to offer a valid explanation for the failure to include in the RFC limitations from mental impairments determined at step two, but instead argued that such limitations need not be included.  179 F. Supp. 3d 481, 485 (E.D. Pa. 2016).  The court noted that "[i]n *Ramirez v. Barnhart*, however, the Third Circuit explicitly rejected this argument."  *Id.*  In *Kich v. Colvin*, "[i]mportantly, the ALJ did not include any limitations in the . . . RFC which could be construed to be related to mental health issues, such as limiting Plaintiff to unskilled work or to performing simple one or two-step tasks . . . ."  218 F. Supp. 3d 342, 357 (M.D. Pa. Nov. 2, 2016).  The RFCs in Plaintiff's out-of-circuit cases likewise contained no such limitations.  *See Richardson*, 511 F. Supp. 3d at 803 (the ALJ quoted a medical source opinion noting various mental limitations "nearly identically, yet included no mention of mental limitations in the RFC"); *Solomon*, 376 F. Supp. 3d at 1022 ("the record is silent on this key issue—the ALJ's opinion does not explain why Solomon's mental impairments were omitted from the RFC"); *Lydon*, 2019 WL 3812379, at *4 ("[T]he ALJ's RFC determination was silent as to any mental impairments whatsoever and relates only to physical impairments.  No accommodation in the RFC relates to or accounts for the finding of Ms.

### C.        Plaintiff's Remaining Argument

In addition, Plaintiff contends that "the ALJ's step five finding cannot support a finding of non-disability as a matter of law because all of the identified occupations are sedentary, and Mr. Thorpe must be found disabled if limited to unskilled work at the sedentary level."  (Pl.'s Br., ECF No. 10, at 3).  However, the Court need not decide whether this issue—which would be addressed at the conclusion of the five-step analysis—constitute a basis for remand.  If on remand the ALJ adopts the sit/stand/walk limitations proffered by Drs. Volokhonsky, Balloqui and Dzurinko, the VE may not identify the same (or any) occupations available to Plaintiff, thus rendering Plaintiff's remaining argument inapplicable.  *See Steinninger v. Barnhart*, No. 04-5383, 2005 WL 2077375, at *4 (E.D. Pa. Aug. 24, 2005) (not addressing additional arguments because the ALJ may reverse his or her findings after remand).  Accordingly, the Court does not consider this additional argument at this time.

### VI.     CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **GRANTED** to the extent that it requests remand.  This matter is remanded for further proceedings consistent with this memorandum.

BY THE COURT:


  /s/ Lynne A. Sitarski_____
LYNNE A. SITARSKI
United States Magistrate Judge

---

Lydon's mental impairments or limitations."); *Simon-Leveque*, 229 F. Supp. 3d at 787 ("The ALJ, however, did not include any nonexertional limitations in the RFC assessment.").  Here, on the contrary, the RFC explicitly includes a restriction "to unskilled, simple, routine tasks and simple decisions . . . ."  (R. 53).